## IN UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| **GLORIA LUJAN PENA,** an individual**,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CAUSE NO. 7:18-cv-217** |
| | § | |
| **THE CITY OF ODESSA** | § | |
| **Defendant.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiff, GLORIA LUJAN PENA, (hereinafter referred to as "PENA" or "Plaintiff") through her attorney, Gerald K. Fugit and bring this action by filing Original Complaint, complaining of discrimination in employment by Defendant, THE CITY OF ODESSA (hereinafter referred to as "CITY" or "Defendant") and in support, would show as follows:

### INTRODUCTION

1.      This is an employment-related action for violations of the Plaintiff's civil rights by CITY provided under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, et seq. ("ADEA").

2.      This lawsuit is brought to prevent Defendant pursuant to Title VII and the ADEA from maintaining a policy, practice, custom or usage of discriminating against, Plaintiff in regard to terms, conditions and privileges of employment, and for damages, and other equitable relief for Plaintiff who has been discriminated against by Defendant on the basis of her Race (Hispanic), Color (brown), National Origin (Mexican), and Retaliation.  Plaintiff also makes a claim of hostile

work environment.

## **PARTIES**

3.      Plaintiff, GLORIA LUJAN PENA, is a Hispanic - female citizen of the United States and a resident of City of Odessa, Ector County, Texas.  Her mailing address is 1402 Glenwood Avenue, Odessa, Ector County, TX 79761.  She is of a Mexican origin and 67 years of age, her Color is brown, and her date of birth is November 26, 1951.  At all-time concurrent with this action Plaintiff is an employee of the Downtown Odessa, Inc., a portion of the CITY dedicated to the creative utilization, historical preservation and promotion of the greater Downtown area for the benefit of CITY, as that term is defined by both 42 U.S.C. § 2000e (f).

4.      The Defendant, the CITY OF ODESSA, is a municipal government, acting by and through its agent, the Downtown Odessa, Inc., a portion of the CITY dedicated to the creative utilization, historical preservation and promotion of the greater Downtown area for the benefit of CITY, and is Plaintiff's "employer" as that term is defined by both 42 U.S.C. § 2000e (b).  The Summon and Complaint may be served to the CITY through its Legal Department located at 411 W 8th Street, Odessa TX 79761.

## **JURISDICTION AND VENUE**

5.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§1331 and 1343.

6.      This action is authorized and instituted pursuant to the Title VII.  Jurisdiction is further proper in this Court under Title VII and United States District Courts have original jurisdiction in suits brought against the CITY.

7.      Venue is proper in Western District of Texas, Midland-Odessa Division pursuant to 28 U.S.C. § 1391(b) as Ector County, Texas.

//

## JURY DEMAND

8.      A jury is hereby demanded.

## ADMINISTRATIVE PREREQUISITES

9.      Plaintiff has complied with all the administrative prerequisite to action under Section 703 of Title VII of the Civil Rights Act of 1964, and amended 42 U.S.C. § 2000e et seq. as follows:

    a.      On or about August 29, 2018, Plaintiff timely filed a written Charge of Discrimination and Complaint with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on Race, National Origin – Hispanic, Color and Retaliation.  A copy of the EEOC charge is attached hereto as **Exhibit "A"** and incorporated herein by reference.

    b.      On or about September 7, 2018, EEOC issued a Notice of Right to Sue letter which Complainant received on September 12, 2018, notifying her that she has a right to sue within ninety (90) days of the receipt of Notice of Right to Sue.  A copy of the Notice of Right to Sue is attached hereto as **Exhibit "B"** and incorporated herein by reference.

    c.      Plaintiff has performed all conditions precedent, if any, required for the filing and pursuit of a claim for judicial relief under Title VII and its related regulations. Plaintiff has complied with all the prerequisites for bringing an action under Title VII and Retaliation.

## FACTS

10.     On or about March 31, 2015, Plaintiff joined as an Executive Assistant at the Downtown Odessa, Inc., a portion of the CITY dedicated to the creative utilization, historical

preservation and promotion of the greater Downtown area for the benefit of CITY.

11.     Plaintiff was a direct employee and was under the supervision of Lawanna Lambert, a Board Member of Downtown Odessa, Inc. ("Ms. Lambert").

12.     Ms. Lambert was a direct employee of the CITY and was under the supervision of City Council of the CITY.

13.     In or about June 2017, Haley Howey ("Ms. Howey") in the Downtown offices asked the Plaintiff to let her use $200.00 petty cash out of her accounting drawer for her first Hot Summer Nights event as she had forgotten to get cash for making change for t-shirt sales.  She never returned it.  Plaintiff kept asking Ms. Howey to return it but she always told that it was somewhere in one of her t-shirt tubs and would get it later which she never did.  When Ms. Lambert came on Board September 2017, Plaintiff let her know about this issue but they never came up with it.  Ms. Lambert told the Plaintiff that "*the CITY did not need to know what goes on in our offices or our non-profit finances.*"

14.     On or about June 19, 2017, the Downtown Odessa Board Meeting was held for Firecracker Fandango event.  Ms. Howey informed the Board that she didn't have the food trucks needed for the event.  The Board started discussing the possibility of cancelling the event altogether.  Plaintiff had been asking Ms. Howey to let Plaintiff help her and asking what Ms. Howey needed and she kept saying "*okay, she would ask her if she needed her help.*"  Plaintiff had no idea that Ms. Howey needed any help.  Plaintiff had no idea that Ms. Howey did not have the necessary food trucks since she did not let Plaintiff help her.  Plaintiff decided to ask the Board if they would allow her to come up with additional trucks as she handled that part before.  The Board said "Yes".

15.     Plaintiff went back to the office and started making calls to all the food trucks as

she had signed them in the previous Fandango.  Ms. Howey also called some.  Ms. Howey and Plaintiff had plenty of food trucks by end of the day.

16.     On or about July 1, 2017, Plaintiff came into the Downtown offices at 8:30 a.m. for Firecracker Fandango event and asked Ms. Howey, where did she need help as it was the biggest event of the year and there was a lot going on out on the grounds.  Ms. Howey told Plaintiff she did not need any help and Plaintiff could stay at the office.  Plaintiff asked what she would be doing in the office from 8:30 until 10:00 p.m. that night.  Ms. Howey asked her to clean her office.  Plaintiff told her that she had been keeping clean the empty director's office and her office area.  Ms. Howey could have told Plaintiff about what she could do out on the grounds, as Plaintiff had worked a lot of areas of the event in the previous year.

17.     Again, on or about July 1, 2017, during the Firecracker Fandango event, Ms. Howey did not give Plaintiff a receipt for the beer.  This time Ms. Howey was the interim director and she gave her a receipt she had created by herself, not the original.  However, Ms. Howey had never given Plaintiff the beer receipt for the event in order for her to put her paperwork together.

18.     Plaintiff has a habit of going to all the vendors and thanking them and asking if everything is well with them.  This is exactly what the Plaintiff did on the night of the event (like in the previous years).  The vendors said "Yes" but Ms. Howey had come around and told them to shut down at exactly 10:00 pm or she was going to have the Police Department shut them down.  Plaintiff was embarrassed due to fact that these were food trucks she convinced them to come and help the event happen.

19.     A clown was hired for the event who also told Ms. Howey that she should let the food trucks stay a little longer because the clown had seen how busy the workers were and probably not had eaten.  Ms. Howey said "No."

20.     In or about August 2017, during the staff meeting or reviews at Downtown office, Ms. Lambert told the Plaintiff that she had a degree and was smart and Ms. Howey also had some good education.  Ms. Lambert asked the Plaintiff that "*if she had looked at the qualifications for her job*."  Plaintiff replied "yes".  Again, Ms. Lambert asked the same question a second time in front of Ms. Howey and Plaintiff answered that "*they knew my qualifications when I had been hired and had been doing my job for the past three years*."  At that time, they looked at each other as if they had already discussed Plaintiff.

21.     On or about September 7, 2017, during the performance evaluation, Ms. Howey gave Plaintiff a Memo to let her know that she had been asked to do Plaintiff's evaluation.  Ms. Howey did it and Plaintiff told her that she disagreed with three (3) of the items.  Ms. Howey asked why and Plaintiff explained.  Ms. Howey told Plaintiff that she had assumed that she was behind on office work since Plaintiff took some of it home.  Plaintiff explained to Ms. Howey the work was done but Plaintiff liked to review her work and the work she was talking about was completed weeks before it was needed.  Ms. Howey did not give her a copy after Plaintiff and Ms. Howey signed.  On the following Friday, Ms. Howey was leaving early and Plaintiff asked for her copy.  Ms. Howey said "No" because she still needed to make changes.  The following Monday, Ms. Howey gave Plaintiff the original for Plaintiff to make a copy.  Ms. Howey had whited out sections and put changes in writing.  Plaintiff said what Ms. Howey added was not very nice.  Plaintiff went to Ms. Lambert and told her what was going on.  Ms. Lambert got Ms. Howey to print out what she had shown to Plaintiff prior to the meeting.

22.     Later on, the same day, Ms. Howey brought additional pages and told the Plaintiff that it was the part of her evaluation which she forgot to give her.  Plaintiff saw where this was written and it started by saying that Plaintiff "*needed to start coming to work on time*" etc.  Plaintiff

knew it was what Mr. Richard Morton ("Mr. Morton") the City Manager, had told Plaintiff that he had instructed Plaintiff to start doing.  Unless it was what Ms. Salinas had given before she left to her new job.  Ms. Howey was writing up Plaintiff for what the City Manager, had come to reprimand Plaintiff.

23.     Mr. Morton and Plaintiff had a visit on Tuesday.  Mr. Morton told Plaintiff that he had been there the previous day to visit with Ms. Howey.  After Mr. Morton left, Ms. Howey asked Plaintiff how their visit had gone and Plaintiff said very well.  Ms. Howey did not care for Plaintiff's answer.  This visit happened right before Ms. Lambert was part of the Downtown office. Plaintiff let Ms. Lambert known that she was going to set up a meeting with Human Resource ("HR") to discuss what she had been given by Ms. Howey.  Plaintiff sent an email to Ms. Kara McQuatters the HR to meet her.

24.     When Plaintiff met with Ms. McQuatters, she told her that Ms. Howey had been asked to give Plaintiff's evaluation in March 2017 and she continued not to do it.  After approximately six months later Ms. Howey gave Plaintiff an evaluation.  Plaintiff showed Ms. McQuatters the additional papers of Plaintiff's evaluation and Ms. McQuatters looked at them and made a comment that she was sure that was not what Ms. Haley wanted to do.

25.     Plaintiff informed Ms. McQuatters she had asked Ms. Howey if she really wanted to turn in her evaluation the way, she had written it all and she answered "yes, she did."  Then, Ms. McQuatters asked "*who would get here on time*" and Plaintiff said "*me*".  Plaintiff also told that Ms. Howey had been there before Plaintiff approximately five (5) times but most of the time it was Plaintiff during the time Ms. Howey was interim director.

26.     On or about December 2, 2017, during the event of Parade of Lights, Ms. Lambert changed her mind how she had Plaintiff coding the present boxes that would be placed on the four

(4) corners of the float.  They had already marked most of one tail end when Ms. Lambert realized the end they were coding was not the back but the front of the float.  Plaintiff suggested to continue and just flip it when the float was reassembled at the Odessa College grounds.

27.     Ms. Lambert got upset and yelled at Plaintiff and asked her to go and get all the gift boxes already taken away and remark them.  Plaintiff went to retrieve them; however, everyone had already placed them pretty solid in the different personal vehicles and mixed in with all the other presents that would be placed all over the float.  A large number had the same wrapping paper.  Plaintiff came back into the bay and mentioned the problem.  Judge Sara K. Billingsley ("Judge Billingsley") heard Plaintiff and said not to bother that it would be figured out when the float was assembled at the location.  Plaintiff did not feel comfortable going through other people's personal vehicles.  Plaintiff did not think any more of it and just made sure to place the parts of the Christmas tree in Plaintiff's vehicle that did not fit in the other vehicles.

28.     On or about December 2, 2017, Ms. Lambert further asked Plaintiff to be at the Odessa College parking lot at 3:00 p.m.  Plaintiff was going to help intake floats to register.  Plaintiff went earlier to drop off Christmas tree in her car that would be part of the float.  When Plaintiff arrived and delivered it, Plaintiff saw Judge Billingsley having to remove the staples.  she had placed on the float's cloth skirt so it would not damage during the drive from the bay.  She held out her hand so that Judge Billingsley could place the staples in her hands without having to stop each time Judge Billingsley pulled one out.

29.     Later on, Ms. Lambert came and had some pliers and started pulling staples out as well.  Plaintiff was between them.  Judge Billingsley told Ms. Lambert to stop tearing the material.  Without thinking, a word came out of Plaintiff's mouth.  Plaintiff actually said it very quietly.  Plaintiff said "Despacito" which means gently and slowly.  Ms. Lambert got upset and took off to

her car and got in and would not come back.  Plaintiff told Judge Billingsley that Plaintiff would probably be in trouble.  Judge Billingsley asked Plaintiff, why and she said it had to have been something she did.  Plaintiff said she didn't think she did anything wrong.  Judge Billingsley told Plaintiff that some people do not like people to speak Spanish.  Plaintiff told Judge Billingsley they would speak in Spanish at the office.

30.     Judge Billingsley finally stopped what she was doing and went to talk to Ms. Lambert.  Plaintiff asked one of the judge's lawyers if she needed help when lifting the heavy buckets.  She told Plaintiff that she had it.  So, all Plaintiff said was "time to go home".  Plaintiff did not come back until 3 p.m. that afternoon.

31.     During the basketball season at UTPB Gym, the Plaintiff was discussed between a group of people who were business people and business owners in the Downtown.  They were discussing that Ms. Lambert was going to fire the Plaintiff.  Ms. Lambert did not make a good environment for Plaintiff knowing and keeping quiet.  It was embarrassing for the offices as part of their conversation was making sure that she would have a job after.  This way Ms. Lambert was dismantling what Plaintiff had worked so hard in building.  Plaintiff let her know during one of her reviews, when Ms. McQuatters was there and it caught Ms. Lambert by surprise and she could not deny it.  So, Plaintiff started pulling some of the stops which she believed started accelerating her mistreatment in trying to get Plaintiff to quit.

32.     It all started with UTPB Ceed Building Training where the computer classes were ongoing all the time.  Ms. Lambert would derail Plaintiff from taking classes that Ms. Lambert said there were some areas where Plaintiff was lacking.  Ms. Lambert would even tell her that she was slow.  This was a game for Ms. Lambert as she did not even care how dumb it came across on all the classes that were going to be taken and then cancelled and she would suggest a new one and

then cancel that one.  Ms. Lambert would say it was going to be something else.  Ms. Lambert would cancel or make up.

33.     On or about December 4, 2017, Ms. Lambert called Plaintiff into her office needing to talk to Plaintiff.  Ms. Lambert let Plaintiff know how condescending Plaintiff was when she said the word "Despacito" and how she had told Judge Billingsley that we spoke Spanish in the office. Plaintiff said "we do".  Plaintiff had been teaching Ms. Lambert some phrases and words because Ms. Lambert was expecting a call from a gentleman from Mexico who was interested in investing in Downtown, just in case Plaintiff was not at the office, when the gentleman called, and she would have some phrases to use of words in order to communicate.  Ms. Lambert's understanding of Spanish is enough to communicate.  Ms. Lambert told Plaintiff that Plaintiff had hurt Julie's feelings, a lawyer from Judge Billingsley's offices.  Plaintiff finally told Ms. Lambert that she promised to never speak another word of Spanish in the office.

34.     Plaintiff told Ms. Lambert how she had been left at the college grounds with all the monies paid for floats.  How she had to call her son from where he was to come and give her a hand.  Ms. Lambert told Plaintiff that she had forgotten about her.  Plaintiff was not surprised as she was always made to feel isolated and was always being made to feel demeaned.

35.     After the parade, Plaintiff let Ms. Lambert know she had gone back to the college parking lot to sign volunteer forms for Haley's School volunteers and helped dismantle the float when Plaintiff saw it come back.  So, when Ms. Lambert called Plaintiff, she thought Ms. Lambert was calling her to tell that how well everything had gone.  Plaintiff told Ms. Lambert that what all she did was to help people all day long, but not knowing Ms. Lambert was watching her all day to see where Ms. Lambert could find fault.

36.     On or about March 9, 2018, Plaintiff wrote a formal complaint letter to Interim

Director, Human Resources, Mr. Darrel Wells and Interim City Manager, Mr. Michael Marrero, and informed them about the hostile and unfair environment of the Downtown Odessa, Inc. offices. A copy of the Letter is attached hereto as **Exhibit "C"** and incorporated herein by reference.

37.     After sending this letter, Plaintiff started being treated better at the office.  In fact, it was much better.  It was not because they wanted to but because she was guessing legal or HR had visited with them.  But after a certain period of time, it went back to the same.  What Plaintiff could figure was that they saw it as an empty threat hearing as Plaintiff was going to be in contact with the EEOC.  However, neither HR nor the City Manager's offices ever tried to contact Plaintiff to see what was going on.

38.     On or about March 15, 2018, Plaintiff prepared a deposit for the SouthWest Bank. She gave the deposit to Ms. Lambert for her approval before taking it to the bank.  After Ms. Lambert looked at it and gave it back to Plaintiff.  Plaintiff took the deposit to the bank and barely made it there before closing.  The bank's clerk took it and gave Plaintiff the deposit slip.  When Plaintiff made the deposit into Quick Books she realized that she was short of $100.00.  The bank was already closed.  Plaintiff called the following morning and spoke with Brandi.  Brandi told her to just make the deposit as a full amount of $3,920.00 instead of $3,820.00.  Brandi said she would run Plaintiff a receipt for the additional $100.00.

39.     When Ms. Lambert came to the work place, she called Plaintiff into her office and said something about getting a call or had been at the bank, which Plaintiff really did not remember and told her about the mistake.  Plaintiff chuckled and said "yes", that she called the bank and told them about the mistake.  Plaintiff was happy she had caught it, but Ms. Lambert was not.  Ms. Lambert told Plaintiff "*she could never trust her with funds again*."  Plaintiff believes she was set up again and it was a pattern.  Plaintiff brought this to her attention about Ms. Howey and dollar

amounts.  She did not point out how three people had not caught it.  Ms. Lambert told Plaintiff she did not add up the amounts because she trusted her.  But now she could not.

40.    On or about March 17, 2018, when Plaintiff was helping Ms. Howey to clear the event grounds after the St. Patrick's Day event, she asked Ms. Howey what to do after three containers left on the sidewalk as she did not know what they were.  Ms. Howey told Plaintiff she had been asked to return only the lids but had been unable to take them off.  Plaintiff told Ms. Howey that she would try.  Plaintiff tried the lids and the lids were pretty tight.

41.    When Ms. Howey asked Plaintiff to take the lids off, she could have been hurt.  It just did not make sense since Ms. Howey knew what they were.  Plaintiff had forgotten to hang on to one of the vendor's check and had it mailed instead.  Ms. Lambert kept bringing it up over and over again at the Monday staff meeting and during every opportunity.  It was the first time that this ever happened to Plaintiff.  Ms. Howey forgot to give the Odessa College performers check which she had with her and Plaintiff never heard anything said about it.  Plaintiff found out when the man came to the office almost a week later to pick it up and Ms. Howey told him how sorry she was to have forgotten to give it to them.

42.    On or about March 23, 2018, Ms. Lambert came into Downtown office and informed Plaintiff that she was on administrative leave and asked her to gather her things and just leave.  Ms. Lambert told to Plaintiff that it was not paid vacation and she needed to stay in the Odessa area until things were sorted in her head and then she would call her.  Plaintiff never received anything in writing or any reason for the decision.  Plaintiff went to HR that afternoon and visited with Mr. Wells.

43.    After that afternoon, Mr. Wells would not talk to Plaintiff or anyone in the CITY but for Mr. Wells calling Plaintiff to tell her that she had to answer to Ms. Lambert and do what

she says.  Everything was handled very unprofessionally.  All the way from the City Manager's office to Downtown offices, even Mr. Wells told Plaintiff that everything had been done wrong.

44.     On or about May 25, 2018, Ray Reynosa ("Mr. Reynosa"), a CITY employee from IT Department came to Plaintiff's office to take her old computer drive.  Mr. Reynosa told Plaintiff that they would be installing her new one upstairs.  Plaintiff told him to go ahead.  Mr. Reynosa told Plaintiff that she had to remove the memory stick on her old drive before they could touch it. Plaintiff told Mr. Reynosa that she would never have one on her computer like that and Plaintiff did not even recognize it.  Plaintiff told Mr. Reynosa that he could go ahead and take it.  He told her that she needed to look at in case it had something in it that she needed.  Plaintiff said "Okay" for them to look at it.

45.     When Plaintiff turned it on, it was a real shocker.  It was the Interim Director of the Keep Odessa Beautiful (KOB), City Department.  It showed the Interim Director lying asleep on a sofa with a baby beside her.  Plaintiff was shocked something like that would be in her computer and turned around to question Mr. Reynosa and at the same time he asked Plaintiff what's this? Mr. Reynosa said it with an angry look on his face.  Plaintiff told Mr. Reynosa that she did not know anything about it or something like that being on her computer.  Mr. Reynosa told Plaintiff that he knew.

46.     Mr. Reynosa even told Plaintiff that he would vouch for her.  He shared with Plaintiff that while she was gone on administrative leave, Ms. Lambert had them come and look through her computer to look for any wrong doing on her part.  He further told Plaintiff that "*he let Ms. Lambert know that Plaintiff was not that kind of person*."  He said that she kept insisting they look into it and realized that she had done something in her computer but had not done it correctly in order to harm her person and character.

47.     Mr. Reynosa further told Plaintiff that if he needed to take the memory stick to the owner or would she like to do that, and then she told Mr. Reynosa that she would like to take it to Mrs. Claudia Ortega ("Mrs. Ortega").

48.     When Plaintiff took it to Mrs. Ortega, like Plaintiff, she was also shocked it was in Plaintiff's computer.  Mrs. Ortega told Plaintiff that she knew it was not her.  She said it had to have fallen out of her purse when she set it on her desk.  Plaintiff asked Mrs. Ortega to think back to people that had been in her office.  She mentioned Ms. Lambert as having been there.

49.     On or about June 12, 2018, during the staff meeting at Ms. Lambert's office, Ms. Lambert gave Plaintiff a list of Downtown businesses as she needed for Plaintiff to find out if the building was vacant or still in used.  If it was still the same business or if it was a different under a new name.  Ms. Lambert said she needed it by Wednesday.  After the meeting, Ms. Lambert stopped at Plaintiff's office and said, "You do understand you have to go to each business?"  Plaintiff replied "*Okay*".  On or about June 13, 2018, at Downtown office, Plaintiff gave Ms. Lambert the list of businesses she had put together for her. Ms. Lambert looked at it and said "*this is good*".

50.     On or about June 15, 2018, Ms. Lambert told she needed to see Plaintiff in her office.  She gave a bad review for insubordination because Plaintiff had given her too much information on the business list.  Ms. Lambert then went on to tell Plaintiff what she was going to use the list for, which she never told Plaintiff before.  Ms. Lambert told her that some of the information was that she was going to get the Board to give her.

51.     Plaintiff told her the businesses had given her additional information and she had included it for her to know.  She also added that if she did not need it, it could just be deleted.  Ms. Lambert really started into Plaintiff.  She had waited until Ms. Howey had left.  Ms. Lambert

would almost always do this when Ms. Howey had left the offices.

52.    As time passed, Plaintiff would know just by the way Ms. Howey would look at the Plaintiff on her way out as to what was coming Plaintiff's way.  Plaintiff saw it as very sick. Ms. Lambert went on to tell Plaintiff that she had only asked to drive by these places because she would never want to put her in any danger, going into places that may not be safe.  On and on, it was all a lie.

53.    Plaintiff reminded Ms. Lambert it had been on her that had put together the first footprint of all the businesses in Downtown.  There was a point when Plaintiff was talking and was so upset at what she was saying that Plaintiff was mouthing words but no sound was coming out.  Plaintiff wondered if that was how it felt to have a heart attack had a smile on her face during this time as she was enjoying it.  When Plaintiff's voice finally came back, she told her that she always tries to give 150% but she was not aware that she was not supposed to do that and would not do it in the future.

54.    Ms. Lambert did something really strange while Plaintiff was just trying to be able to even talk.  She leaned towards Plaintiff and asked "Are you hungry?"  Plaintiff answered "No". Ms. Lambert then asked "Do you not get hungry with stress like this?"  Again, the Plaintiff answered "No".  When Plaintiff got home, all she could do was sit there in shock and could not even speak thinking of what she had just gone through.  She finally shared with her husband what had just happened.  Ms. Lambert would have Plaintiff do things and then plot how to turn them around, without ever giving a thought of the damage they were doing to Plaintiff and her family and how many years it took for that person to build what they so carelessly were tearing down.

55.    Plaintiff felt harassed at a high level; fear started creeping into the picture.  The environment became toxic and she felt isolated because no one had done anything for her from

HR.

56.     Ms. Lambert would always be telling Plaintiff that if she did any of these, she would fire her.   When Ms. Lambert would give her reviews or evaluations and sometimes when Ms. McQuatters was also there, Plaintiff was always made to sign even though she did not want to.   At no time, did Ms. McQuatters as an HR person or Ms. Lambert ever told Plaintiff that she did not have to sign.   Plaintiff did not learn this, until she started going to the Workforce Commission looking for a job.   She was always made to feel pressured, forced, intimidated and coerced into signing untrue documents and attacking her character.

57.     On or about June 19, 2018, Ms. McQuatters told the Plaintiff that she needed to take Unlawful Harassment Prevention Course.   As she was working on it when Ms. Lambert came into her office to make copies.   Ms. Lambert also told the Plaintiff that she had already completed the course some time ago.   As Plaintiff studied the course more, it kept describing the way she was being treated along with describing the things that Ms. Lambert would do with her all the time. Not only had she done the severe behavior but the pervasive behavior was going on all the time. Plaintiff printed the parts of the course and highlighted some of the parts that she could relate to. Ms. Lambert would duplicate some of the actions described in the course.   Once Plaintiff would see something like that she could follow the pattern she had.   Other times she would reverse what Ms. Howey had been addressed to Plaintiff.   It was a game to Ms. Lambert or both of them, but very damaging to Plaintiff and her family livelihood.

58.     On or about June 21, 2018, at Downtown office, HR sent Mrs. Pricilla Martinez ("Mrs. Martinez") to be present when Ms. Lambert fired the Plaintiff.   Ms. Lambert said even though she really liked her passion for Downtown but she was not a good fit.   Ms. Martinez mentioned that she had been sent because Ms. McQuatters was out of town.   She went on to explain

what would be done with Plaintiff's investment and about her payroll. Plaintiff was not paying close attention; however, because what stayed with Plaintiff was that she was being fired on 21st but being paid until later in the month.

59.   Plaintiff brought it up during the hearing with the Workforce Commission because Plaintiff wanted them to understand it was not anything she had agreed to.  During the hearing, Ms. Martinez was present, and Ms. McQuatters was not present.  The investigator asked Mrs. Martinez what she knew about it. Mrs. Martinez explained the Legal Department had made the decision to do that.  For Plaintiff, it comes across as an insult to her intelligence.  She guesses she was to think "what a nice gesture" and not continue to follow through with what needed to be done because they had thrown Plaintiff a bone.

60.   Mrs. Martinez tried interjecting, during the firing process, how she had been the one to hire the Plaintiff by telling Ms. Lambert and asking her, "how long was that Plaintiff, 3 years ago she had hired her?"  Ms. Lambert could have cared less because she did not even acknowledge Mrs. Martinez talking.  Ms. Lambert just wanted Plaintiff gone.  When Plaintiff asked Mrs. Martinez if she could get things that were hers out of her office, she answered "yes, she could" and she went to her area with her.

61.   Ms. Lambert followed and kept saying she could help taking things to her car. Plaintiff said she did not need her help.  She was behaving sickly sweet, until she told Plaintiff that she needed to give her Plaintiff's computer passwords.  It had always bothered Ms. Lambert to not know the Plaintiff's passwords all the time.  Something she always demanded.  The Plaintiff was told by Ms. Lambert to give her and Ms. Howey her password on several occasions.

62.    Ms. Lambert told Plaintiff not to lock her computer, but, Mrs. Martinez told Plaintiff to lock her computer and told Ms. Lambert it was to remain locked.  From her body

language, it appears she did not agree with what Ms. Lambert was doing.  When they got to Plaintiff's car, she asked why the Plaintiff had not gone to her with what was happening.  Plaintiff explained that HR had placed the Department under Ms. McQuatters.

63.     Plaintiff was terminated by Ms. Lambert on June 21, 2018.  A copy of Letter of Termination is attached hereto as **Exhibit "D"** and incorporated herein by reference.

64.     Defendants terminated Plaintiff without conducting a thorough and complete investigation into the allegations lodged against Plaintiff.

65.     When the Plaintiff was fired, she had found that at some point of time during the Firecracker Fandango event, Ms. Lambert had told Mr. John Herriage, a previous Board Member ("Mr. Herriage") that "*she needed to get rid of the Old Mexican and replace her with a younger person that would work.*"  Plaintiff could not talk to Mr. Herriage before that because Ms. Lambert had already told Plaintiff that if she would speak with Mr. Herriage, Ms. Lambert would fire her.

66.     Plaintiff believes and therefore alleges that she was terminated because of her race, national origin, color and retaliation against her.

67.     Plaintiff believes and therefore alleges she was terminated because of her race as she was the only Hispanic employee in the office and the other employees, such as Ms. Howey, Ms. Lambert, Supervisor, Darrell Wells, Head of Human Resources and Ms. McQuatters, Human Resources are all Anglo.

68.     Plaintiff believes and therefore alleges she has been discriminated due to her age, 66 years as Ms. Lambert told Mr. Herriage about replacing her with someone younger.

69.     Plaintiff believes and therefore alleges she was suffered disparate treatment from Defendant when they treated other employee more favorably than her such as Ms. Howey, as whenever Mr. Howey made mistakes, it was always okay with Ms. Lambert; however, when

Plaintiff made mistakes, she was written up and told she would be fired if she made one more mistake.

70.     Defendant CITY discriminated Plaintiff herein since the agents and employees of CITY engaged in discrimination based on Age, Race, National Origin, Color and Retaliation in violation of Title VII of the Civil Rights Act and ADEA.

## COUNT ONE
### [TILE VII VIOLATION – RACE DISCRIMINATION (HISPANIC)]

71.     Plaintiff repeats, alleges and hereby incorporates by reference the preceding allegations contained in Paragraphs 1 through 70 of this Complaint, as if each and every one was fully and completely set forth at length herein.

72.     Plaintiff is a member of a protected class and was subjected to unfavorable treatment by the CITY and its employees because of her race (Hispanic).

73.     CITY discriminated against Plaintiff herein since the agents and employees of CITY engaged in discrimination based on Race in violation of Title VII of the Civil Rights Act.

74.     Defendant, CITY intentionally discriminated Plaintiff because of her race in violation of Title VII by terminating her from the employment as she was the only Hispanic employee in the group and all other employees were Anglo.  Plaintiff is entitled to relief under Title VII.

75.     Plaintiff's race/national origin was a determining or motivating factor in Defendant's actions.  Specifically, the Plaintiff was subjected to, disparate treatment, hostile work environment and retaliation as direct result because of her Race (Hispanic).  Plaintiff's complaint of hostile and unfair environment at workplace was not handled in a proper and confidential manner because of her Race (Hispanic).  In addition, Plaintiff was treated dissimilarly because of her Race.

76.     As a direct and proximate result of these actions, Plaintiff suffered Race (Hispanic) discrimination.

77.     By doing the above acts complained of, Defendant has damaged Plaintiff in her ability to earn a living, has caused Plaintiff great mental, emotional and psychological pain.

78.     By reason of the Defendant's actions, the Plaintiff found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorney's fees pursuant to Title VII and under the general equity powers of the Court.

**COUNT TWO**
**[TILE VII VIOLATION – NATIONAL ORIGIN (MEXICAN)/COLOR DISCRIMINATION (BROWN)]**

79.     Plaintiff repeats, alleges and hereby incorporates by reference the preceding allegations contained in Paragraphs 1 through 70 of this Complaint, as if each and every one was fully and completely set forth at length herein.

80.     Plaintiff is a member of a protected class and was subjected to unfavorable treatment by CITY because of her color and national origin.

81.     The CITY has discriminated the Plaintiff as the agents and employees of the CITY engaged in discrimination based on national origin and color in violation of Title VII of the Civil Rights Act.   Specifically, Plaintiff suffered discrimination as well as adverse employment consequences as a direct result of national origin (Mexican) and color **(Brown)**

82.     The unlawful employment practices in violation of Title VII of the Civil Rights Act herein complained of, occurred in the course of Plaintiff's employment with the CITY, were carried on by Defendant's agents, servants, and employees and committed because of Plaintiff's national origin.

83.     Specifically, Plaintiff was the only Hispanic employee in the group due to which she was subjected to the unequal treatment as she was aware of other employees, such as Ms.

Howey (Anglo).  In a similar situation, Ms. Howey was always treated differently compared to the Plaintiff.  When Ms. Howey made mistakes, she was always told "it was okay" but when Plaintiff made any mistake she was written up and told that she would be fired if she made one more mistake.  Thus, the Plaintiff was subjected to discrimination as a direct result of het National Origin (Mexican) and Color (Brown).

84.     As a direct and proximate result of these actions, Plaintiff suffered National Origin (Mexican)/Color discrimination and harassment.

85.     By doing the above acts complained of, Defendant has damaged Plaintiff in her ability to earn a living, have caused Plaintiff great mental, emotional and psychological pain.

86.     By reason of the Defendant's actions, Plaintiff found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorney's fees pursuant to Title VII and under the general equity powers of the Court.

## COUNT THREE
## [TILE VII VIOLATION – RETALIATION]

87.     Plaintiff repeats, alleges and hereby incorporates by reference the preceding allegations contained in Paragraphs 1 through 70 of this Complaint, as if each and every one was fully and completely set forth at length herein.

88.     Plaintiff was an employee of Downtown Odessa, Inc., a portion of the CITY dedicated to the creative utilization, historical preservation and promotion of the greater Downtown area for the benefit of CITY, as per the term "Employee" defined under Title VII 42 U.S.C.S. § 2000e(b).

89.     The CITY acting by and through its agent, the Downtown Odessa, Inc., and is Plaintiff's "employer" as that term is defined by both 42 U.S.C. § 2000e (b).

90.     Plaintiff engaged in protected activity pursuant to Title VII of the Civil Rights Act

of 1964, 42 U.S.C.S. § 2000e et seq.

91.     CITY through its agents, servants, and employees retaliated against Plaintiff for opposing an ongoing harassment and hostile work environment; filing the formal complaint with Interim Director, Human Resources and Interim City Manager for opposing CITY's unlawful employment practices under Title VII.

92.     Specifically, Plaintiff, suffered adverse employment consequences as a direct result of making formal complaints to Mr. Darrell Wells, Interim Director, Human Resources and Mr. Michael Marrero, Interim City Manager on March 9, 2018; complaining to them about her harassment by Ms. Lambert.  As a direct and proximate result of these actions, Plaintiff suffered retaliation.

93.     Plaintiff was subjected to adverse employment action when she complained to the Interim Director, Human Resources and Interim City Manager of the CITY and that she was being targeted by Ms. Lambert for opposing harassment and hostile work environment.

94.     Apparently, because of this complaint to the CITY's representatives or agents or employees, Plaintiff was terminated on June 21, 2018, without any reason by Ms. Lambert. Therefore, Plaintiff was a victim of discrimination from the time she reported the incident of discrimination to Human Resources and Interim City Manager.

95.     By doing the above acts complained of, Defendant have damaged Plaintiff in her ability to earn a living, have caused Plaintiff great mental, emotional and psychological pain.

96.     By reason of the Defendant's actions, Plaintiff, found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorney's fees pursuant to Title VII, and under the general equity powers of the Court.

## COUNT FOUR
### [TILE VII VIOLATION – DISPARATE TREATMENT]

97.     Plaintiff repeats, alleges and hereby incorporates by reference the preceding allegations contained in Paragraphs 1 through 70 of this Complaint, as if each and every one was fully and completely set forth at length herein.

98.     Plaintiff suffered disparate treatment from Defendant when it treated other similarly situated individuals more favorably than her.  Plaintiff was the only Hispanic employee in the group. She was aware of other employees, such as Ms. Howey (Anglo), who was treated differently as compared to Plaintiff in a similar scenario.

99.     The CITY's actions constitute disparate treatment under Title VII and they were done willfully and knowingly in violation of Title VII and entitle Plaintiff to equitable relief, compensatory and punitive damages under Title VII.

100.    By doing the above acts complained of, Defendant have damaged Plaintiff in her ability to earn a living, have caused Plaintiff great mental, emotional and psychological pain.

101     By reason of the Defendant's actions, Plaintiff, found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorney's fees pursuant to Title VII, and under the general equity powers of the Court.

## COUNT FIVE
## [WRONGFUL TERMINATION BASED ON RACE]

102.    Plaintiff repeats, alleges and hereby incorporates by reference the preceding allegations contained in Paragraphs 1 through 70 of this Complaint, as if each and every one was fully and completely set forth at length herein.

103.    Plaintiff engaged in protected activity pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.

103.    Plaintiff is a member of protected class i.e. Hispanic.

104.    Plaintiff was qualified and was working as Executive Assistant with the CITY.

Plaintiff never resigned or quit from the job.

105.    Specifically, the Plaintiff was subjected to disparate treatment when she opposed harassment and hostile work environment and later terminated without any just cause despite of her qualifications because of her Race (Hispanic).

106.    Defendant failed to assign any reasons when it wrongfully terminated the Plaintiff. Plaintiff's termination was not for good cause.

107.    Plaintiff's position from which she was terminated was given to someone who is not a member of the protected class.  She is Hispanic in her mid to late 20's.

108.    Plaintiff experienced unwelcome harassment, disparate treatment, discrimination, and retaliation by CITY and its employees such as Ms. Lambert and other management officials which resulted in a hostile work environment.

109.    By doing the above acts complained of, Defendant have damaged Plaintiff in her ability to earn a living, have caused Plaintiff great mental, emotional and psychological pain.

110.    By reason of the Defendant's actions, Plaintiff, found it necessary to retain the services of an attorney in these proceedings and heretofore and is therefore entitled to attorney's fees pursuant to Title VII, and under the general equity powers of the Court.

## COUNT SIX
### [ADEA VIOLATION - DISCRIMINATION BASED ON AGE]

111.    Plaintiff repeats, alleges and hereby incorporates by reference the preceding allegations contained in Paragraphs 1 through 70 of this Complaint, as if each and every one was fully and completely set forth at length herein.

112.    Plaintiff was an employee of Downtown Odessa, Inc., a portion of the CITY dedicated to the creative utilization, historical preservation and promotion of the greater Downtown area for the benefit of CITY, as per the term "Employee" defined under ADEA 29

USCS § 630(f).

113.    The CITY acting by and through its agent, the Downtown Odessa, Inc., and is Plaintiff's "employer" as that term is defined by ADEA 29 USCS § 630(b),

114.    Pursuant to 29 USC § 623(a)(1) it is unlawful for an employer, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his/her compensation, terms, conditions, or privileges of employment, because of such individual's age.

115.    At all times relevant herein, Plaintiff was 66 years of age and her date of birth is November 26, 1951.

116.    Plaintiff was engaged in a protective activity.

117.    Plaintiff demonstrated her capacity and ability to perform all job tasks to which she was assigned.  Plaintiff never refused from performing any work.

118.    Plaintiff was subjected to adverse employment actions.  Defendants act constituted a violation of 29 USC § 623 to which Plaintiff is entitled to Relief.

119.    Through its actions described above, Defendant CITY violated the ADEA including when Defendant replaced Plaintiff by someone younger outside the protected class.

120.    Defendant, CITY, further violated the ADEA by disciplining and terminating Plaintiff.  Plaintiff was qualified in her job, was disciplined and discharged as described above, and other employees outside Plaintiff's age range were treated differently and better than Plaintiff.

121.    Plaintiff's age was a determining factor in Defendant's decision to terminate and take other adverse actions against her.

122.    Defendant's actions were willful and performed with malice and with reckless indifference to the state-protected rights of Plaintiff.

123.    As a result of CITY's actions, Plaintiff requests equitable relief, liquidated damages, economic damages and non-economic damages in amounts to be determined at trial. Plaintiff found it necessary to retain the services of an attorney in these proceedings heretofore and is therefore entitled to attorney's fees pursuant 29 U.S.C. § 626(b).

## COUNT SEVEN
## [TILE VII VIOLATION – HOSTILE WORK ENVIRONMENT]

124.    Plaintiff repeats, alleges and hereby incorporates by reference the preceding allegations contained in Paragraphs 1 through 70 of this Complaint, as if each and every one was fully and completely set forth at length herein.

125.    The actions of CITY constituted a hostile work environment for Plaintiff in the creation and condoning of a hostile work atmosphere which changed the terms and conditions of her employment.

126.    Plaintiff is a member of a protected class as discussed above.  Plaintiff was subjected to unwelcome harassment at the work place by creating negativity in all aspects of her work, denying her reasonable training opportunities, giving her conflicting and inadequate management, subjecting her to racial, national-origin, age and gender discriminatory statements at the workplace, severe behavior at the workplace, creating a toxic environment to make her feel isolated because no one had done anything for her from HR.

127.    The harassment of which Plaintiff complains was severe and pervasive and altered the terms and conditions of her employment and created a hostile and abusive work environment.

128.    The unlawful employment practices in violation of the Civil Right Act herein complained of, occurred in the course of Plaintiff's employment with the CITY, was carried on by Defendant's agents, servants, and employees and committed because of Plaintiff's national origin, age, gender and her opposition to discrimination in the work place made the work environment

one that a reasonable person could not endure without injury.

129.    CITY did not exercise reasonable care to prevent and cure allegations of harassment and hostile and unfair environment at the workplace.  Defendant failed to handle complaint made by Plaintiff in a confidential manner.  Defendant failed to ratify the wrongful conduct by failing to take appropriate remedial action for Ms. Lambert's conduct.

130.    By doing the above acts complained of, Defendants have damaged Plaintiff in her ability to earn a living, have caused Plaintiff great mental, emotional and psychological pain.

131.    By reason of the Defendant's actions, the Plaintiff found it necessary to retain the services of an attorney in these proceedings heretofore and is therefore entitled to attorney's fees pursuant to the Title VII, and under the general equity powers of the Court.

## ATTORNEY'S FEES

132.    Plaintiff is entitled to an award of attorney's fees under Title VII, 42 USCS § 2000e-5(k).

133.    Defendant discriminated against Plaintiff herein since the agents and employees of Defendant engaged in discrimination based on age in violation of ADEA.  Specifically, Plaintiff suffered adverse employment consequences as a direct result of her age (over 40 years).  As a direct and proximate result of these actions, Plaintiff suffered age discrimination.

134.    The unlawful employment practices in violation of the ADEA herein complained of, occurred in the course of Plaintiff's employment with Defendants, and were carried on by Defendants' agents, servants, and employees and committed because of Plaintiff's age.  Therefore, Plaintiff is entitled to an award of attorney's fees pursuant to 29 U.S.C. § 626(b).

135.    Specifically, the Plaintiff was subjected to hostile work environment and retaliation as direct result because of her age (over 40 years).  Plaintiff's complaint of hostile work

environment at workplace was not handled in a proper and confidential manner because of her age (over 40 years).  In addition, Plaintiff was treated dissimilarly because of her age.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendant be cited to appear and answer this complaint; and that upon trial of the merits before as a jury, this Court enter as a judgment for Plaintiff awarding Plaintiff the following relief:

a.      A declaratory judgment, declaring Defendant's acts, through the acts of its agents, and employer, herein complained of to be in violation of Title VII of the Civil Rights Act of 1964 and Retaliation.

b.      Compensatory and punitive damages against the CITY for the violation of Plaintiff's rights, as protected by Title VII, Title I of the ADA and ADEA for her pain, suffering, emotional distress, humiliation, harassment and for any resulting physical and emotional damages, in the amount of three hundred thousand dollars ($300,000.00);

c.      Attorney's fees, prejudgment and post judgment interest as provided by law including Title VII; and

d.      Such other and further relief to which Plaintiff may justly be entitled.

Respectfully submitted,

By: /s/ GERALD K. FUGIT
Gerald K. Fugit
fugitassist@att.net
GERALD K. FUGIT, P.C.
412 N. Texas Avenue
Odessa, TX 79761
Tel: (432) 332-1661
Fax: (432) 335-0003
State Bar No. 07501000
Attorney for Plaintiff
GLORIA LUJAN PENA